Cite as 2024 Ark. App. 332

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-23-114

| | |
|---|---|
| BARBRA DAVIS, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ALEX DAVIS, DECEASED<br><br>APPELLANT<br><br>V.<br><br>JEFFERSON HOSPITAL ASSOCIATION, INC., D/B/A JEFFERSON REGIONAL MEDICAL CENTER; JEFFERSON REGIONAL MEDICAL CENTER PREFERRED PROVIDER ORGNIZATION; MAI SALAH ABD-ALQADER M.D.; STEVEN H. WRIGHT, M.D.; AYMAN ABDUL HAMEED ALSHAMI, M.D.; AND JOHN AND JANE DOES A–Z<br><br>APPELLEES | Opinion Delivered May 22, 2024<br><br>APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CV-20-530]<br><br>HONORABLE ROBERT H. WYATT, JR., JUDGE<br><br><br><br><br><br><br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## STEPHANIE POTTER BARRETT, Judge

Appellant Barbra Davis appeals the dismissal of her complaint for medical

malpractice against appellees Jefferson Hospital Association, Inc., d/b/a Jefferson Regional

Medical Center and Jefferson Regional Medical Center Preferred Provider Organization

(Collectively "JRMC"); Steven Wright, M.D.; Ayman Abdul Hameed Alshami, M.D.; Mai

Salah Abd-Alqader, M.D.; and John and Jane Does A–Z.[1] On appeal, Barbra argues that the circuit court abused its discretion in dismissing her complaint against Dr. Abd-Alqader on the basis of insufficiency of service of process; in dismissing her negligent-supervision claims against Dr. Wright; and in dismissing her complaint based on independent claims of medical malpractice after two surgeries as to Dr. Alshami and JRMC. We affirm in part and reverse and remand in part.

On August 1, 2020, Barbra filed a wrongful-death complaint as the personal representative of the estate of Alex Davis, deceased, against the appellees, alleging their medical negligence caused the wrongful death of her husband. On March 17, 2021, Dr. Alshami filed a motion to dismiss the complaint against him on the basis that the statute of limitations had run; alternatively, he argued Barbra had failed to state a claim that would entitle her to relief because she had not alleged facts to show that Dr. Alshami violated the standard of care or that his actions were the proximate cause of Alex's death. On April 6, 2021, Dr. Abd-Alqader filed a motion to dismiss Barbra's complaint against her on the basis of insufficiency of service of process. A hearing on both of these motions was held on June 8, 2021. On June 15, the circuit court entered an order finding that Barbra's complaint failed to state a claim on which relief could be granted against Dr. Alshami, and it granted her until July 9 to file an amended complaint. On June 28, the circuit court entered an

---

[1]Barbra moved to dismiss John and Jane Does A–Z without prejudice, which was granted by the circuit court. She also abandoned any pending but unresolved claims in her notice of appeal.

order dismissing Dr. Abd-Alqader from the lawsuit with prejudice due to Barbra's failure to properly serve her.

Barbra filed her amended complaint on July 9, alleging that Alex had two stents placed in his heart for blockages in June 2018 and two more stents placed in his heart in July 2018; both surgeries were performed by Dr. Alshami, a cardiologist, at JRMC. On July 30, 2018, Alex and Barbra went to the JRMC emergency room due to a black spot on the big toenail of Alex's left foot; the spot began to spread to the tip of Alex's big toe and to the toenail next to it as they waited in the emergency room. Alex was admitted to JRMC and diagnosed with a blockage in his left leg due to circulatory complications caused by diabetes; Dr. Alshami performed surgery on Alex's leg on July 31, 2018, because the blockage was restricting the leg's blood flow. The two previous stent surgeries as well as the latest surgery on Alex's leg were performed using contrast dye. Barbra alleged that Dr. Alshami, Dr. Wright, and the other defendants had a duty to make sure to follow any instructions before, during, or after the procedure; avoid certain contrast dyes because of the risk of developing contrast-induced acute kidney disease (CKI); allow sufficient time for elimination of contrast dye before re-administering; avoid repeated or higher doses of contrast dye; and perform long-term monitoring for CKI, which they failed to do.

Barbra alleged that on August 1, she noticed Alex had a spot on his lower left leg near his ankle that was oozing clear liquid. Dr. Abd-Alqader, a medical resident physician at UAMS Family Practice Center Pine Bluff who, was supervised by Dr. Wright, Alex's primary-care physician, diagnosed the spot as an infection and prescribed antibiotics for Alex to take

3

home with him; she also ordered a wound specialist, who cleaned the wound and wrapped it with gauze and bandage wrap. Alex was released from the hospital on August 2 with instructions on how to care for the wound and with a follow-up appointment scheduled for August 8. On August 8, Dr. Abd-Alqader examined the wound, stated that it was healing well and Alex did not need more antibiotics, and placed an Unna boot on Alex's foot that went to Alex's knee to help with the fluid retention in his leg. Dr. Abd-Alqader instructed Alex not to get the boot wet and to keep it on his leg for one week.

Alex's foot began to hurt with a burning sensation on August 9; although Barbra called Dr. Abd-Alqader and the clinic told Barbra they would give her the message, neither Dr. Abd-Alqader nor Dr. Wright returned her call. Alex went to his follow-up appointment on August 15 early due to the pain; when the nurse unwrapped the Unna boot, the skin came off of Alex's foot, and the foot looked black and burned. When Dr. Abd-Alqader and the wound specialist entered the exam room, the wound specialist asked Dr. Abd-Alqader if Alex's foot looked like that the week before; Barbra said it had not looked like that, and Dr. Abd-Alqader agreed and stated that the foot had gotten worse. Dr. Abd-Alqader made arrangements for Alex to be admitted to the hospital, but she never returned to the exam room; Alex was taken to the main hospital by a nurse from the clinic, where he was admitted. Barbra alleged that one of the night nurses in the hospital told her that the surgery had compromised Alex's leg, the leg should not have been wrapped because it would cut off circulation, and that if the doctor did not know what she was doing, she should have asked someone who knew the correct procedure for handling that situation. On August 16, Alex's

4

wound was treated with dermal wound cleanser and a silver sulfadiazine cream, which Barbra asserted that she later learned was actually causing the infection to spread. Alex was scheduled to be released from the hospital on August 17, but Barbra told the hospital staff that she did not feel comfortable taking care of Alex's foot in its condition because it was beyond the scope of her abilities, so Alex remained in the hospital for the weekend. On August 18, as nurses began to clean his wound, Alex began vomiting and was unable to keep food down. The nurse called Dr. Abd-Alqader, and several hours passed without a response; when the nurse gave Alex Phenergan, it caused him to be "loopy" and act impaired. Alex began throwing up again on August 19 after he ate his dinner.

Barbra told the case manager that she wanted Dr. Abd-Alqader to be removed from Alex's case because her treatment of Alex's foot was wrong and was the cause of his problems and because she did not return phone calls. Barbra alleged that this was when she learned that Dr. Wright was a professor at the UAMS residency program and was responsible for the care and treatment administered by residents to Alex. On August 20, Dr. Wright actively took over Alex's case, sending him to ICU for medication for the infection. Barbra told Dr. Wright she did not want Dr. Abd-Alqader to continue caring for Alex and wanted Alex transferred to a Little Rock hospital; Dr. Wright told Barbra that they could change doctors, but he could take care of it, and Alex elected to allow Dr. Wright to proceed with treatment. Barbra told Dr. Wright that he had one day to rectify the situation, but Dr. Wright told her that he needed three days; Barbra agreed to three days, but she told Dr. Wright that if she saw no improvement in three days, she wanted a transfer.

5

On August 21, while still in ICU at JRMC, Barbra noticed Alex had stopped talking, and his body had begun to shake. Later that morning, Dr. Ashley James, DPN, APN, informed Barbra that Alex's kidneys were failing, that the antibiotic he had been given was too strong, and that his kidneys had been damaged.

On August 22, at 9:00 a.m., Barbra asked a nurse about Alex's shaking, his problems swallowing, and the fact that he was not eating. Alex became unresponsive after that time. Barbra alleged that at about 2:30 p.m., Dr. Wright sent Dr. Nathan, a resident, to discuss Barbra's concerns about Alex's shaking, not eating, not talking, and sleeping all the time. Dr. Nathan told Barbra that the medication Alex was taking could make him shake, but he did not have any answers as to why Alex was not talking and sleeping all the time. Barbra told Dr. Nathan that she wanted a transfer to Arkansas Heart Hospital; Dr. Nathan told her that he would talk to Dr. Wright about it. Dr. Wright ordered an MRI in an attempt to determine why Alex was shaking. Dr. Alshami stopped by at 3:30 p.m. to visit Alex; he requested a neurologist be contacted to look into Alex's issues. Barbra noticed that Alex was being given a new medication; when she asked what it was, she was told that it was Keppra, a medication the doctor had ordered for seizures because it was believed Alex could be experiencing seizures, and it was being given as a preventative measure.

On the morning of August 23, Dr. Alaali, the critical care doctor, told Barbra that Alex was experiencing organ failure—his liver and both kidneys were not functioning. Barbra again informed the nurse that she wanted Alex transferred to Arkansas Heart Hospital; however, she was told that Dr. Ferguson would not authorize the transfer because they were

6

providing the best care and were doing all they could for Alex. Barbra attempted to have Alex transferred on her own, but she was told that Dr. Wright had to authorize the transfer. Barbra was then told that Dr. Ferguson had approved the transfer, but JRMC staff would not check bed availability; Barbra kept calling Arkansas Heart Hospital until she learned that a bed was available.

On August 24, while still at JRMC, Dr. Attwood told Barbra that Alex needed dialysis, or he would not live. Before he was transferred to Arkansas Heart Hospital, a nurse administered Reglan, Protonix, Lasix, and furosemide intravenously to Alex. After transferring Alex to Arkansas Heart Hospital, Barbra told Dr. Vasil Lendel Alex's history; it was his opinion that the dye from the surgeries started the infection because it was administered on three occasions, which affected his kidneys; and his left foot was toxic, with several infections growing on it. It took five days to control Alex's foot infection, and dialysis was begun to see if it would help Alex's kidneys.

On August 25, Dr. Glasco informed Barbra that Alex's kidneys had been healthy on August 15, but his creatine levels were now at 6, indicating severe kidney disease; Alex was septic; and his foot had gangrene. Alex's creatine level increased to 7 on August 26. Barbra was asked why JRMC had administered furosemide in an IV because that was not the manner in which that medication was usually administered. Furthermore, while Alex's A1C at JRMC was 1400–1500, his A1C at the Heart Hospital was 11 when he was given insulin.

Alex's health became worse on August 27. Dr. Glasco stated that they had done all they could do, and Dr. Lendel and his nurse practitioner stated that all of Alex's issues were preventable. Alex elected to stop dialysis because his kidneys were not improving.

Barbra alleged that the defendants and John and Jane Does A–Z negligently and carelessly performed their duties, and their actions fell below the standard of care of medical-care providers and were the proximate cause of her damages. Barbra further alleged that the defendants failed to properly diagnosis Alex's condition; caused a delay in the proper diagnosis of Alex's condition; failed to perform proper procedures on Alex; and failed to inform Barbra or obtain her consent. Barbra also alleged Dr. Wright had failed to properly supervise Dr. Abd-Alqader in her care and treatment of Alex; Dr. Abd-Alqader's care of Alex fell below the standard of care; Dr. Abd-Alqader, Dr. Wright, and JRMC failed to properly treat Alex's wound; and Dr. Alshami performed three surgeries on Alex using dye, and he should have informed Alex of the risks in using the dye and should have remained actively involved in Alex's care and treatment.

I. *Dismissal for Failure to Obtain Service – Dr. Mai Salah Abd-Alqader*

Barbra first argues that the circuit court erred in dismissing her complaint against Dr. Abd-Alqader due to insufficiency of process. Service of valid process is necessary to give a court jurisdiction over a defendant; service requirements, being in derogation of common-law rights, must be strictly construed, and compliance with them must be exact. *Tinney v. Childs*, 2023 Ark. App. 255, 668 S.W.3d 516. When issues turn on court rules and precedents about commencement of service, which are issues of law, our review is de novo.

*McCoy v. Robertson*, 2018 Ark. App. 279, 550 S.W.3d 33. But appellate courts review a circuit court's factual conclusions regarding service of process under a clearly erroneous standard. *Wright v. Wright*, 2023 Ark. App. 512, 678 S.W.3d 640. Disputes over the sufficiency of service raise questions of fact, and "the credibility of the evidence to rebut proof of service [is] a matter for the circuit court to decide." *Thomas v. Gray*, 2023 Ark. App. 281, at 2, 669 S.W.3d 37, 39 (quoting *Branson v. Hiers*, 2021 Ark. App. 284, at 6, 625 S.W.3d 748, 752). A finding regarding the sufficiency of service is not disturbed on appeal unless the appellate court is left with a definite and firm conviction that a mistake has been committed. *Thomas, supra*.

Rule 4(g)(1)(A)(i) of the Arkansas Rules of Civil Procedure governs service of process by mail; it requires that service of process shall be by certified mail, addressed to the person to be served with return receipt requested, with delivery restricted to the addressee or the agent of the addressee. The addressee must be a natural person, specified by name; and an agent of the addressee must be authorized in accordance with U.S. Postal Service regulations.

Dr. Abd-Alqader's motion to dismiss Barbra's complaint, filed on April 6, 2021, included an affidavit asserting that she had not signed for any U.S. mail naming her as a defendant in an Arkansas lawsuit, and she did not have any agents authorized to sign on her behalf for any U.S. mail. Barbra responded to the motion to dismiss on April 12, asserting that Dr. Abd-Alqader was properly served; attached to the motion was a copy of the green card showing that she mailed the summons and complaint by certified mail, restricted

delivery, return receipt requested, to an address in Hillsborough, New Jersey, and that the mail was delivered and signed for by the addressee on March 15, 2021.

On April 16, Dr. Abd-Alqader filed a reply again denying that she had signed for the certified mail as well as a second affidavit stating that she was not at the address referenced on the green card on March 15 at 11:09 a.m., the time it was delivered, because she had worked a twelve-hour shift at a medical center in Pennington, New Jersey, that day from 7:00 a.m. to 7:00 p.m. She claimed that the dismissal should be without prejudice, given the Arkansas Supreme Court's temporary suspension of the 120-day service requirement under Arkansas Rule of Civil Procedure 4(i) due to the COVID-19 pandemic. However, on June 3, Dr. Abd-Alqader filed a sur-reply in support of her motion to dismiss, asserting that Davis's claim against her should be dismissed with prejudice since service suspension had been lifted, and service of process for pending cases was to be made by May 31, 2021, the time remaining under Rule 4(i), or within the time remaining under any order extending the time for service, whichever was later. *In re Response to the COVID-19 Pandemic–Resumption of Deadlines for Serv. of Process*, 2021 Ark. 67 (per curiam). Dr. Abd-Alqader argued that she had not been properly served; that medical-negligence actions are subject to a two-year statute of limitations; that all allegations relating to her involvement in Alex's care occurred no later than August 15, 2018; that the statute of limitations had run on allegations of medical negligence; and that the complaint against her should be dismissed with prejudice.

A hearing was held on Dr. Abd-Alqader's motion to dismiss on June 8, 2021. Her attorney asked that the complaint against her be dismissed because Barbra had failed to

10

properly serve Dr. Abd-Alqader within the time allowed under Rule 4(i), and he requested that the dismissal be with prejudice because the statute of limitations had run as to Dr. Abd-Alqader. Her counsel stated that Rule 4(i) required Barbra to serve Dr. Abd-Alqader within 120 days from the filing of her lawsuit, which was on August 1, 2020, or that an extension to serve Dr. Abd-Alqader be filed, which was not done. Counsel noted that service requirements had been suspended during the COVID-19 pandemic but that the supreme court had reinstated the service requirements and set a deadline for service as of May 31, 2021, if that was the longest period of time. Counsel pointed out that Dr. Abd-Alqader had completed an affidavit stating that she never signed for any certified mail nor did she have an agent authorized to sign for her; she also filed a second affidavit stating that she could not have signed for the mail on March 15 because she had worked a twelve-hour shift that day and was not at that address when the mail was delivered. The circuit court found Barbra had failed to properly serve Dr. Abd-Alqader within the required time, Barbra had failed to meet her burden of proof that the green card was signed by Dr. Abd-Alqader, and Barbra had failed to timely seek an extension to serve her. The circuit court further found that Barbra was not entitled to avail herself of the provisions of Arkansas Rule of Civil Procedure 4(k), "if only because of Dr. Abd-Alqader's decision to file a motion to dismiss in lieu of filing an answer."

We hold that the circuit court properly dismissed Dr. Abd-Alqader from the lawsuit with prejudice because Barbra failed to show that she had properly served her. The lawsuit was filed on August 1, 2020; Barbra purported to have served Dr. Abd-Alqader by certified

11

mail on March 15, 2021. While normally Barbra would have had 120 days from that date to either serve Dr. Abd-Alqader or seek an extension in which to do so, the deadlines for service time requirements under Rule 4(i) were suspended by our supreme court in *In re Response to the COVID-19 Pandemic—Amendments to Court Rules*, 2020 Ark. 164 (per curiam). However, pursuant to *In re Response to the COVID-19 Pandemic*, 2021 Ark. 67, the supreme court announced the resumption of service deadlines effective immediately, and service of process for pending cases was to be made by May 31, 2021, within the time remaining under Rule 4(i) or within the time remaining under an order extending the time for service, whichever was later. Because the 120-day time period for service of process had passed and no extension order had been sought, Dr. Abd-Alqader had to be served by May 31, 2021.

Barbra argues on appeal that the green card showed that the certified mail containing the summons and complaint had been signed for by the addressee, Dr. Abd-Alqader, and she never stated that the summons and complaint were not sent to the proper address, only that she was not at the address on March 15, 2021, when the certified mail was delivered. But the circuit court found, in an order entered on June 28, 2021, that Dr. Abd-Alqader was never properly served within the required time, and there was no request for an extension of time to serve her. The evidence presented at the hearing was that someone signed the green card, and the box stating that it was the addressee was checked; however, Dr. Abd-Alqader filed two affidavits stating that she never signed for any certified mail; she had no designated agent authorized to sign for her; and that she was not present at the address when

the certified mail was delivered because she was at work. We cannot say that the circuit court's factual decision, given Dr. Abd-Alqader's affidavits, was clearly erroneous.

The circuit court further found Barbra could not avail herself of Rule 4(k), which provides that any error regarding the sufficiency of service of process shall be disregarded if the circuit court determines that the serving party "substantially complied" with the service requirements, that the defendant received actual notice of the complaint, and the defendant filed a timely answer, because Dr. Abd-Alqader filed a motion to dismiss instead of filing an answer. Barbra states, without citing any authority, that "given the evidence in the record," the time for service should have been extended. However, Barbra knew as early as April 6, 2021, the date Dr. Abd-Alqader filed her motion to dismiss, that she was disputing receipt of proper service of process. Barbra failed to file a motion to extend the time to properly serve Dr. Abd-Alqader, and her request was not made until June 8, during the hearing on Dr. Abd-Alqader's motion to dismiss. A motion for extension of time for service of process must be made "within 120 days of filing of the suit or within the time period established by a previous extension." Ark. R. Civ. P. 4(i)(2). The service deadline in this case was May 31, 2021. No motion for extension was made until June 8 at the hearing on the motion to dismiss; therefore, Barbra's motion was untimely. Rule 4(i) provides that if service is not made within 120 days and no timely motion to extend is made, dismissal of the action is mandatory, but the dismissal-without-prejudice language in Rule 4(i) is not applicable if a plaintiff's actions are otherwise barred by the running of the statute of limitations. *McCoy v. Robertson*, 2018 Ark. App. 279, 550 S.W.3d 33. The order dismissing Dr. Abd-Alqader

13

for insufficient service of process was filed on June 28, 2021, over ten months after the statute of limitations had run; therefore, Dr. Abd-Alqader was properly dismissed from the suit.

However, we hold that the circuit court erred in dismissing Dr. Abd-Alqader with prejudice. In *Jones v. Douglas*, 2016 Ark. 166, at 7–9, 489 S.W.3d 648, 653–54, our supreme court held:

> Our savings statute, Arkansas Code Annotated section 16–56–126 (Repl. 2005), provides in part:

> (a)(1) If any action is commenced within the time respectively prescribed in this act, in §§ 16–116–101—16–116–107, in §§ 16–114–201—16–114–209, or in any other act, and the plaintiff therein suffers a nonsuit, or after a verdict for him or her the judgment is arrested, or after judgment for him or her the judgment is reversed on appeal or writ of error, the plaintiff may commence a new action within one (1) year after the nonsuit suffered or judgment arrested or reversed.

> The savings statute reflects the General Assembly's "intent to protect those who, although having filed an action in good faith and in a timely manner, would suffer a complete loss of relief on the merits because of a procedural defect." *Rettig v. Ballard*, 2009 Ark. 629, at 3–4, 362 S.W.3d 260, 262 (citing *Linder v. Howard*, 296 Ark. 414, 757 S.W.2d 549 (1988)). The case of *Rettig v. Ballard*, 2009 Ark. 629, 362 S.W.3d 260, is instructive. In that case, the summonses were defective in that they indicated that the defendant had twenty days to respond, rather than the correct thirty days; this court held that the plaintiff was entitled to the benefit of the savings statute because the complaint was timely filed and the complaint and summons, though defective, were timely served. This court quoted with approval the statement in *Arkansas Civil Practice and Procedure* that the savings statute applies if "a timely, completed attempt at service is made but later held to be invalid." David Newbern, John Watkins & D.P. Marshall Jr., *Arkansas Civil Prac. & Proc.* § 5:10 (5th ed. 2011).

> Here, the circuit court found that the savings statute did not apply because service of process was not completed. For service outside Arkansas, Rule 4(e) (2008) provides that service may be made "when reasonably calculated to give actual notice" by mail

as provided in Rule 4(d)(8). According to Arkansas Code Annotated section 16–58–132, where service of summons, process, or notice is provided by registered or certified mail, and the addressee "refuses to accept delivery, and it is so stated in the return receipt of the United States Postal Service, the written return receipt, if returned and filed in the action, shall be deemed an actual and valid service of the summons, process, or notice."

Here, the summonses and complaints were mailed to appellees by registered mail at their last known address in Costa Rica, return receipt requested. Appellants assert that when the summonses and complaints were "refused," service was then and there "completed" as provided for by Arkansas Code Annotated section 16–58–132 and the Arkansas Rules of Civil Procedure. Arkansas Rule of Civil Procedure 4(d)(8)(A)(i) (2008) provides in pertinent part: "Service of a summons and complaint upon a defendant ... may be made ... by any form of mail addressed to the person to be served with a return receipt requested and delivery restricted to the addressee or the agent of the addressee." When the envelopes containing the complaints and summonses were returned to appellants' attorney, each envelope was marked with a Costa Rican postal service stamp that contained several options for delivery; each envelope was marked "refused." Rule 4 provides that upon notice of refusal, the plaintiff must promptly send the papers by first class mail, which appellants' attorney represented to have done. The circuit court relied on affidavits from appellees Douglas and Morrison that they did not refuse mailed service or authorize anyone else to refuse it for them; however, those same affidavits state that they did not personally check their post-office box in Costa Rica and instead sent their farm manager to do so. Thus, while the farm manager may not have been "authorized in accordance with U.S. Postal Service Regulations" under Rule 4(d)(8)(A)(i), we need not decide whether this was adequate to prove service via refusal.

We hold that appellants made a timely, completed *attempt* to serve appellees and should be afforded the benefit of the savings statute.

As in *Jones*, in the present case, while service was found by the circuit court to be defective, there was a timely completed attempt to serve Dr. Abd-Alqader—Barbra sent the summons and complaint certified mail, restricted delivery with return receipt requested; there was no assertion that the certified mail was sent to an incorrect address, and the return receipt came back with the purported signature of the addressee, although illegible. *See*

15

*Thomas v. Gray*, 2023 Ark. App. 281, at 10, 669 S.W.3d 37, 43, *reh'g denied* (July 19, 2023), *review denied* (Sept. 21, 2023). Therefore, because there was a timely completed attempt of service, although defective, Barbra should be afforded the benefit of the savings statute. The dismissal of Dr. Abd Alqader should have been without prejudice, and we reverse and remand on this issue.

## II. *Dismissal of Negligent-Supervision Claim – Dr. Steven Wright*

After Barbra filed her amended complaint, Dr. Wright moved to dismiss the negligence allegations against him, arguing that to the extent Barbra was stating claims for negligence occurring prior to August 1, 2018, such claims were barred by the two-year statute of limitations; that he could not be held liable for alleged negligent supervision of Dr. Abd-Alqader because she had been dismissed with prejudice from the action; alternatively, he could not be held liable for alleged negligent supervision of Dr. Abd-Alqader because the Arkansas Supreme Court has expressly rejected negligent credentialing claims; and Barbra's complaint failed to state facts to support the negligence claims asserted but merely recited conclusory statements. Barbra resisted Dr. Wright's motion, arguing that the claims were not time-barred and that her claims were not based on negligent credentialing but rather direct liability and supervisory liability imposed on a teaching doctor for acts of a resident because Dr. Wright was Davis's primary-care physician, and Dr. Abd-Alqader was a resident under Dr. Wright's supervision.

A hearing was held on October 22, 2021, on Dr. Wright's motion to dismiss. In an order filed on November 10, 2021, the circuit court granted in part and denied in part the

16

motion to dismiss, dismissing Barbra's claim against Dr. Wright as to the alleged negligent supervision of Dr. Abd-Alqader with prejudice but denying dismissal with respect to the remaining counts against Dr. Wright based on his own alleged acts of negligence independent of Dr. Abd-Alqader, which may have occurred after August 1, 2018.

On March 31, 2022, Dr. Wright moved for summary judgment on the remaining counts of alleged negligence against him, arguing that Barbra had failed to support her claim that his treatment of Alex fell below the standard of care with expert testimony, while his expert had established that his treatment had met the standard of care, and the proximate cause of Alex's injuries had nothing to do with any negligent act or omission on the part of Dr. Wright. In an order filed on October 27, 2022, the circuit court granted Dr. Wright's motion for summary judgment in its entirety.[2]

In reviewing a circuit court's decision on a motion to dismiss, the facts alleged in the complaint are treated as true and viewed in the light most favorable to the plaintiff. *Worden v. Kirchner*, 2013 Ark. 509, 431 S.W.3d 243. In testing the sufficiency of a complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Id.* Our standard of review for the grant of a motion to dismiss under Arkansas Rule of Civil Procedure 12(b)(6) is whether the circuit court abused its discretion. *Id.*

---

[2]Barbra makes no argument on appeal that the circuit court erred in granting Dr. Wright's motion for summary judgment; she argues only that the circuit court abused its discretion in dismissing her negligent-supervision claims against Dr. Wright.

We affirm the circuit court's dismissal of Barbra's negligent-supervision claim against Dr. Wright. Under the theory of negligent supervision, employers are subject to direct liability for the negligent supervision of employees when third parties are injured as a result of the tortious acts of employees. *Jackson v. Ivory*, 353 Ark. 847, 120 S.W.3d 587 (2003). Liability for negligent supervision is based on the unique relationship between employer and employee. *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001). In order to recover under a theory of negligent supervision, a plaintiff must show that an employer knew or, through the exercise of ordinary care, should have known that its employee's conduct would subject third parties to an unreasonable risk of harm. *Paulino v. QHG of Springdale, Inc.*, 2012 Ark. 55, 386 S.W.3d 462. As with any other negligence claim, to prove negligent supervision, a plaintiff must show that the employer's conduct was a proximate cause of the injury and that the harm to third parties was foreseeable; it is not necessary that the employer foresee the particular injury that occurred, only that he or she reasonably foresee an appreciable risk of harm to others. *Jackson, supra.*

In her amended complaint, Barbra alleged that "Dr. Abd-Alqader was at all relevant times a resident medical physician at UAMS Family Practice Center Pine Bluff being supervised by Dr. Steven Wright." Barbra further alleged, "Dr. Wright had a duty to properly supervise the care and treatment being given by Dr. Abd-Alqader, a resident. Dr. Wright failed to properly supervise her in the care and treatment of Alex  Even if an employee-employer relationship could be assumed at the time of Dr. Abd-Alqader's alleged negligence, Barbra failed to plead facts to show that Dr. Wright's conduct was a proximate cause of

18

Alex's injury and that Dr. Wright knew or should have known that Dr. Abd-Alqader's conduct would subject Alex to an unreasonable risk of harm. We affirm the circuit court's dismissal of Barbra's negligent-supervision claim against Dr. Wright.

### III.  *Dr. Ayman Abdul Alshami*

Dr. Alshami, who performed Alex's two stent surgeries and the surgery on his leg in June and July 2018, moved to dismiss Barbra's original complaint on the grounds that the statute of limitations had expired on the claims against him prior to the filing of her complaint, and the complaint failed to state facts that would show he violated the standard of care or that his actions were the proximate cause of Alex's death. A hearing on this motion was held on June 8, 2021; on July 15, the circuit court entered an order finding that Barbra's complaint stated conclusory allegations against Dr. Alshami but did not provide sufficient facts to support those conclusions, and it gave her until July 9, 2021, to file an amended complaint. After Barbra filed her amended complaint, Dr. Alshami filed another motion to dismiss the amended complaint, alleging that the claims against him regarding the surgeries were barred by the statute of limitations, and Barbra had failed to allege any facts within the applicable statute of limitations that he had violated the standard of care or that any of his actions were the proximate cause of Alex's death.

A hearing was held on the motion to dismiss on October 22, 2021. In an order filed on November 10, 2021, the circuit court dismissed Barbra's claims against Dr. Alshami with prejudice, finding that the amended complaint did not state facts to show that he had violated the standard of care on or after August 1, 2018; the statute of limitations for medical

19

malpractice is two years; and because her claims against Dr. Alshami related to surgeries that occurred in June and July 2018 and Barbra did not file her original complaint until August 1, 2020, the claims against Dr. Alshami were barred by the two-year statute of limitations.

In reviewing a circuit court's decision on a motion to dismiss, the facts alleged in the complaint are treated as true and viewed in the light most favorable to the plaintiff. *Worden*, *supra*. In testing the sufficiency of a complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Id.* Our standard of review for the grant of a motion to dismiss under Rule 12(b)(6) is whether the circuit court abused its discretion. *Id.*

On appeal, with no citation to authority, Barbra argues that the circuit court abused its discretion in dismissing her claims. She contends Dr. Alshami had an obligation to perform long-term monitoring for CKI after the surgeries, and he did nothing to manage that risk. She further contends that Dr. Alshami visited Alex in the hospital on August 22, 2018, and requested that a neurologist be contacted to determine why Alex was shaking, but he did nothing else after August 2018 to manage Alex's risk of CKI.

Dr. Alshami performed two surgeries, one in June 2018 and the second in July 2018, to place stents in Alex's heart. He performed a third surgery on July 31, 2018, to open a blockage in Alex's left leg due to complications caused by diabetes. Contrast dye was used in all three surgeries. In the amended complaint, Barbra asserted that Dr. Alshami had a duty to follow any instructions before, during, or after the procedure; to avoid certain contrast dyes because of the risk of Alex developing CKI; to allow sufficient time for

elimination of contrast dye before re-administering; to avoid repeated or higher doses of contrast dye; and to perform long-term monitoring for CKI, and the failure to do so proximately caused Alex's death. Barbra also asserted that Dr. Alshami failed to follow up with Alex for several days after performing the procedures.

All actions for medical injury must be commenced within two years after the cause of action accrues. *Harris v. Ozment*, 83 Ark. App. 94, 117 S.W.3d 647 (2003); Ark. Code Ann. § 16-114-203(a) (Repl. 2016). The date of accrual of the cause of action shall be the date of the wrongful act complained of and no other time. *Harris*, *supra*; Ark. Code Ann. § 16-114-203(b).

In *Harris*, Rachel Harris underwent gastric-bypass surgery in November 1989; in March 2000, Rachel sought medical treatment when she began to suffer weight loss, depression, hair loss, skin lesions, extreme fatigue, exhaustion, and kidney and liver dysfunctions; she was advised that she was suffering from severe metabolic and mineral deficiencies as a result of her prior gastric bypass and the lack of postoperative care from her doctor, Kerry Ozment. Rachel filed a medical-malpractice action against Ozment on February 21, 2022, alleging that Ozment was negligent in not informing her about the postoperative effects of the surgery and in his postoperative care by not placing her on mineral supplements. The circuit court granted Ozment summary judgment because the suit was barred by the two-year statute of limitations. Rachel's daughter Christina appealed, and this court affirmed, holding that it has long been the law in Arkansas that the statute of limitations for medical malpractice begins to run from the date that the negligent act

21

occurred; in that case, the surgical date in November 1989, when Ozment failed to inform Rachel of the postoperative effects of the gastric bypass surgery at the time surgery was performed.

The present case is on point with *Harris*. The latest date that the statute of limitations for medical malpractice could have begun to run as to Dr. Alshami was July 2018, when he performed the last surgery. Barbra did not file her medical-malpractice suit until August 2020, which was more than two years after the surgeries. We note that the sole act complained of after August 1, 2018, was that Dr. Alshami came by Alex's hospital room on August 22, 2018, and he requested that a neurologist be contacted to determine the cause of Alex's shaking. However, Barbra did not allege how this action was negligent. The circuit court did not abuse its discretion in dismissing Barbra's suit against Dr. Alshami because it was barred by the statute of limitations.

IV. *Motion to Dismiss – JRMC*

On September 9, 2021, JRMC moved to adopt Dr. Alshami's and Dr. Wright's motions to dismiss. After a hearing on the motion on October 22, 2021, the circuit court granted it and dismissed the claims against JRMC with prejudice. Given that we affirm the circuit court's dismissal of Barbra's complaints against both Dr. Alshami and Dr. Wright, we summarily affirm the dismissal of her complaint against JRMC for the same reasons.

Affirmed in part; reversed and remanded in part.

HARRISON, C.J., and VIRDEN, J., agree.

*Willard Proctor, Jr., P.A.*, by: *Willard Proctor, Jr.*, for appellant.

22

*Mitchell, Williams, Selig, Gates & Woodyard, PLLC*, by: *Benjamin D. Jackson* and *Cara D. Butler*, for separate appellees Jefferson Hospital Association, Inc., and Jefferson Regional Medical Center Preferred Provider Organization.

*Wright, Lindsey & Jennings LLP*, by: *Gary D. Marts, Jr.*, *David C. Jung*, and *Shelby N. Howlett*, for separate appellees Mai Salah Abd-Alqader, M.D., and Steven Wright, M.D.

*Wright, Lindsey & Jennings LLP*, by: *Scott D. Provencher*, for separate appellee Ayman Abdul Hameed Alshami, M.D.